

# In the Missouri Court of Appeals

## Eastern District

### DIVISION ONE

STATE OF MISSOURI,       )       No. ED102369
      )
      Respondent,       )       Appeal from the Circuit Court
      )       of the City of St. Louis
vs.       )
      )       Hon. Rex M. Burlison
DYANTHANY PROUDIE,       )
      )       Filed:
      Appellant.       )       May 24, 2016

Dyanthany Proudie ("Defendant") appeals from the judgment entered after a jury trial on his conviction for murder in the first degree. We affirm.

The sufficiency of the evidence at trial is not challenged on appeal. Viewed favorably to the verdicts, it established the following.

On January 2, 2013, Ebony Jackson ("Victim") was visiting St. Louis from Oklahoma with her four-month old baby. That evening, she and the baby went to dinner with Defendant, whom Victim had previously dated. After dinner, they all went back to the Defendant's apartment building. When they arrived, they went to the first floor apartment where Defendant was going to let her stay while in town. Maurice Holtzclaw was living in that apartment with his family at the time. While Defendant did not always stay at that apartment, he had unfettered access and would regularly come and go as he pleased. Defendant's nephew, Ahmad Williams, was also staying at that apartment while

on a holiday break from college. Williams, Holtzclaw and another teenaged nephew were all at the apartment when Defendant and Victim arrived with the baby. Williams and Holtzclaw testified at trial for the State about what happened next.

After visiting with the others and having her luggage brought in from her car, Victim went into the bathroom to clean out the tub for a bath. Defendant signaled for the others to go somewhere else. They all went to the living room of this "shotgun" style apartment: there was a living room in the front, then a bedroom, the kitchen and another bedroom in the back. The bathroom was off the kitchen. Holtzclaw saw Defendant walk into the bathroom with a .38 caliber gun. Holtzclaw and Williams heard one "pop" or gunshot. They all "froze," and then Defendant called Holtzclaw back to the bathroom and closed the door between the bedroom and the kitchen. Holtzclaw saw Victim lying motionless on the bathroom floor with a lot of blood around her. Victim had been shot in the head behind the ear at close-range, severing her spine and immediately killing her.

Defendant dragged Victim out into the hallway, put bags around her head and wrapped her body in a blanket. Defendant directed his nephews and Holtzclaw to help clean up. They used bleach to clean up the blood in the bathroom and the blood that had seeped through the floor into the basement. Despite the cleanup efforts, blood and Victim's DNA was later detected by investigators in the bathroom. Defendant told Holtzclaw to help him with Victim's body. They put her body in the trunk of her car, which Holtzclaw drove while Defendant followed behind in his own car. They left her car in a derelict neighborhood and returned to the apartment. Over the next day or so, Defendant and Holtzclaw removed and replaced the bathroom floor tiles, repainted the walls and the basement ceiling and burned other bloodstained items. Defendant told

Williams and Holtzclaw that he killed Victim because she gave him a sexually transmitted disease, which he had passed on to his current girlfriend.

Defendant's nephews tended to Victim's baby the night of the murder and the next day until Defendant took the child. He promised not to hurt the baby because the baby had not done anything to him. The baby was found abandoned and without identifying information in the hallway of a nearby apartment building two days after the murder, on January 4th. He was unharmed and was later identified by a local relative of Victim's. The baby's father was contacted and came from Oklahoma to take custody of the child. He informed police that Victim was missing. He had not heard from her since a text exchange on January 2nd. Police later found Victim's car with her body in the trunk.

Defendant warned his nephews not to tell anybody about this. Williams testified that he was scared and did not have plans to say anything; he just wanted to get back to college. When contacted by police, Williams initially said he did not know anything about the murder. He feared for his life because he had been threatened. Eventually, he told the police what he had witnessed. Later, Williams saw that his face had been cut out of the family pictures at his grandmother's house.

Defendant told Holtzclaw that if asked by the police about this, he was to say nothing. Holtzclaw believed the police were looking for him and was "ducking them." Defendant reminded Holtzclaw that he was "old enough to know what happen[s] to people who testify." Ultimately, Holtzclaw talked to the police. At first, he tried to be loyal to Defendant and lied about what he knew, but then started to tell "bits and pieces of the truth." After failing a polygraph test, Holtzclaw told the police the truth. At some

point, Holtzclaw learned that his wife was having an affair with Defendant and that he was being threatened by Defendant and his family.

Defendant was found guilty of first-degree murder and was sentenced as a prior and persistent offender to life imprisonment without the possibility of probation or parole. He was also found guilty of armed criminal action, for which he received a thirty-year sentence. The sentences are to be served concurrently. This appeal follows.

In his first two points on appeal, Defendant argues that the trial court erred in excluding the testimony of Chad Jones. On the first day of trial, Defendant's counsel announced that he had been approached by Jones while visiting Defendant in custody on the weekend before trial began. Jones was in custody with Defendant at the time. Counsel told the court that he believed Jones would testify in a way that exculpated Defendant and explained that Defendant wanted to put on an alternative perpetrator defense. At that point, counsel had not yet actually spoken to Jones because he was waiting to get permission from Jones's counsel. Then, during a break in voir dire, counsel informed the court he had met with Jones and wanted to endorse him as a witness. The court allowed the late endorsement over the State's objection, but reserved ruling as to the admissibility of the testimony.

Holtzclaw testified that he was at a barbeque with Jones about a year and half after the murder. Holtzclaw was asked if he told Jones at that time that he was "in trouble" or "messed up badly," and Holtzclaw said "no." He was asked if he told Jones that he put Victim in the trunk of her vehicle, and Holtzclaw said he did not recall the particular conversation because it was just a group of people standing around talking. But he testified that he "probably" told Jones he was the one who took Victim's body to a

4

derelict neighborhood. When asked if he told Jones he killed Victim, Holtzclaw said "no" he absolutely did not ever say anything like that. He also testified that if he said something like that, it was untrue: "I mean I don't kill people, that's not what I do. I wouldn't have killed that lady."

During a break in his testimony, the trial court indicated that since Holtzclaw denied making the statement about killing Victim, Jones might be able to testify that he heard Holtzclaw make the statement in order to impeach Holtzclaw's credibility. But the court was concerned about admitting that out-of-court statement for the truth of the matter. Defendant argued that Jones's testimony was admissible to impeach the credibility of Holtzclaw, but also that the statement was admissible substantively because it qualified as a declaration by Holtzclaw against his penal interest under Chambers v. Mississippi, 410 U.S. 284 (1973). The trial court asked if Jones's testimony would be used "as bias or inconsistent statement or . . .," and Defendant responded that it was offered to impeach the credibility of Holtzclaw because he denied making the statement and "would offer it as substantive evidence," but believed that under Chambers, he must defer to the court. Ruling was reserved, and Defendant was told he could make an offer of proof later, if necessary. Holtzclaw then resumed his testimony, during which he again denied ever having a conversation with Jones about doing anything to harm Victim.

After Holtzclaw's testimony concluded, the court ruled that the inculpatory statement Jones would claim Holtzclaw made was an extra-judicial statement and required assurances of reliability before being admissible. Apparently considering some of the factors set out in Chambers, but without citing it, the trial court found that the statement was not sufficiently reliable because it was not made spontaneously at or near

5

the time of the incident to a close friend or in confidence and was not corroborated by any other evidence. Moreover, the court questioned whether the statement exonerated Defendant and noted that Holtzclaw twice denied making the statement. The court ruled that it would not allow Jones to testify, but Defendant was allowed to make an offer of proof, in which Jones testified that he heard Holtzclaw say his "intention was robbing the girl and it went bad and he end up shooting her and he took the body out of there and moved it." After the offer of proof, the trial court again concluded that the testimony was not sufficiently reliable and was without any substantial corroboration.

In the motion for new trial, Defendant claimed that excluding Jones's testimony impeded Defendant's ability to present his defense that Holtzclaw committed the murder and that the trial court erroneously applied the Chambers test because Holtzclaw was an available witness. On appeal, Defendant contends the testimony was admissible as substantive evidence of an alternative perpetrator and, because it was a prior inconsistent statement, was admissible as substantive evidence under Section 491.074. We agree that these are the grounds on which this evidence could have been admitted. But for the following reasons, we find no reversible error.

Generally, a defendant may introduce evidence tending to show that another person committed the charged offense, but only if there is proof that the other person committed some act directly connecting him with the crime. State v. Speaks, 298 S.W.3d 70, 86 (Mo. App. E.D. 2009); State v. Bowman, 337 S.W.3d 679, 686 (Mo. banc 2011). Here, as the State concedes, Holtzclaw was directly connected to the crime by his own admissions that he was present when Victim was shot, cleaned up the blood evidence and disposed of the body. Having established the threshold showing of a clear link between

6

Holtzclaw and the corpus delicti, an inculpatory statement by Holtzclaw would be relevant to Defendant's alternative perpetrator defense.

But the statement was hearsay because it was made out-of-court and was offered for its truth, namely that Holtzclaw, not Defendant, killed Victim. Thus, to be admissible, the statement must fit within an exception to the hearsay rule. See State v. Woodworth, 941 S.W.2d 679, 690 (Mo. App. W.D. 1997) (although direct connection established, proffered evidence was hearsay and only admissible as substantive evidence because it met hearsay exception in Section 491.074); see also Speaks, 298 S.W.3d at 86 (proffered testimony regarding alternative perpetrator was inadmissible hearsay); State v. Brown, 916 S.W.2d 420, 422-43 (Mo. App. E.D. 1996) (proffered evidence had "serious hearsay problems"); State v. Clark, 859 S.W.2d 782, 787-88 (Mo. App. E.D.1993) (statements were inadmissible hearsay when offered to show alternative perpetrator). Two hearsay exceptions are at issue in this case: declaration against penal interest and prior inconsistent statement under Section 491.074.

Declarations against penal interest made by a non-party may be admissible in a criminal case as a due process right, but only under the following circumstances: (1) the declarant is unavailable as a witness; (2) the statement, if true, would exonerate the defendant; and (3) the statement carries substantial indicia of reliability in that it is (a) self-incriminatory and undeniably against self-interest, (b) made spontaneously to a close acquaintance shortly after the crime; and (c) corroborated by other admissible evidence. Chambers, 410 U.S. at 300-01; State v. Davidson, 982 S.W.2d 238, 241 (Mo. banc 1998). But such statements "are never admissible unless the declarant is unavailable to testify as a witness." State v. Chapman, 876 S.W.2d 15, 19 (Mo. App. E.D. 1994). Here,

7

Holtzclaw was the declarant of the statement sought to be admitted and he was not only available, *he testified at trial*. Thus, the statement was not admissible as a declaration against penal interest.[1]

Because he testified at trial, the other exception to the hearsay rule raised on appeal was applicable. Section 491.074 provides that a prior inconsistent statement of a witness testifying at trial in this type of criminal case "shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement." But Defendant offered Jones's testimony only for "impeachment" or "to impeach Holtzclaw's credibility." Offering a prior inconsistent statement only to impeach a witness does not preserve a claim that the statement was admissible as substantive evidence under Section 491.074. Davidson, 982 S.W.2d at 241; State v. Shifkowski, 57 S.W.3d 309, 315 (Mo. App. S.D. 2001). Defendant never mentioned the statute as a basis for its admission as substantive evidence; instead, Defendant relied only on Chambers to support admission of this evidence as a declaration against penal interest. Moreover, this basis for admissibility was not raised in Defendant's motion for new trial. Because it was not properly preserved, we review only for plain error and will reverse only if the exclusion of this evidence resulted in a manifest injustice or a miscarriage of justice. See State v. McKay, 459 S.W.3d 450, 455-56 (Mo. App. E.D. 2014). Even if Jones's testimony about Holtzclaw's prior inconsistent statement was admissible on this ground and tended to support the alternative perpetrator defense,[2] Defendant cannot show

---

[1] Though we base our conclusion on the declarant's availability at trial, we agree with the trial court's conclusion that this statement was also not sufficiently reliable because it was not made at or near the time of the crime to a close friend in confidence and was not corroborated.

[2] Had it been properly offered on this ground, there nevertheless may have been foundational problems. To lay the foundation for the admission of a prior inconsistent statement as substantive evidence, the proponent must show whether the witness made the statement and whether the statement is true. Bowman,

the necessary outcome-determinative prejudice that is needed to prove a manifest injustice or miscarriage of justice from the exclusion of that evidence in this case.

Cases that have found outcome-determinative prejudice from the exclusion of alternative perpetrator evidence have done so under much different circumstances. For instance, in Woodworth, the evidence against the defendant was tenuous and, in particular, did not show that the defendant had a motive for the crime. 941 S.W.2d at 692. The victim testified at trial that he had not seen his assailant, but in a prior inconsistent statement identified his assailant as someone other than the defendant. Id. at 690. The court of appeals found that exclusion of that statement and other evidence that someone else had a motive to commit the crime could have affected the outcome of the trial. Id. at 692. In McKay, this Court found similar outcome-determinative prejudice amounting to plain error from the exclusion of the following significant alternative perpetrator evidence: the victim said this alternative perpetrator resembled the man who robbed her and clothes matching her description of the robber's clothes were found concealed in his sofa; this other person owned the same type of gun as the one used in the robbery; he called his girlfriend from the victim's stolen cell phone shortly after the robbery and then later gave the stolen phone to his girlfriend, telling her he stole it from a white person; he was identified by eyewitnesses as the person who sold the victim's

741 S.W.2d at 13-14. Holtzclaw clearly denied making a statement to Jones in which he confessed to killing Victim. But the truth of the statement itself is unsupported. According to the offer of proof, Jones would have testified that he heard Holtzclaw say he tried to *rob* Victim but it went badly and he ended up shooting her. There was no other evidence suggesting Victim was robbed before she was shot; rather the evidence was uncontroverted that she was alone in the bathroom preparing to take a bath when she was shot in the head at close range. There was also no other evidence that Holtzclaw actually made the statement. See e.g., State v. Archuleta, 955 S.W.2d 12, 15 (Mo. App. W.D. 1997) (proper foundation for victim's prior statement laid after she claimed at trial not to recall events on the night of the crime, but officer testified she told him that night that defendant assaulted her, which was supported by her physical appearance).

stolen phone; and he attempted to steal another cell phone in the immediate vicinity eight days after the charged robbery. 459 S.W.3d at 459-60.

Here, Defendant was not significantly restrained from presenting his defense that Holtzclaw was the true killer just because he was not allowed to present an alleged confession by Holtzclaw that was uncorroborated by and inconsistent with the other evidence at trial. There was already evidence before the jury directly connecting Holtzclaw with the crime and relevant to this defense theory: Holtzclaw admitted he was present at the scene and participated in the destruction and concealing of evidence, "ducked" the police and lied to them when confronted about the crime. Counsel cross-examined Holtzclaw extensively to show his motive for testifying against Defendant because of his own involvement in the crime. Moreover, there was overwhelming evidence of Defendant's guilt that simply would not have been overborne by Jones's testimony. The eyewitnesses gave identical accounts of how this crime occurred and who committed it: Victim went in the bathroom alone to take a bath, and Defendant went in alone after her and shot her in the head because she had given him an STD. The eyewitnesses also both testified about Defendant's threats to harm them if they snitched and his extensive efforts to remove and destroy evidence to conceal his crime. We cannot say that had the jury heard Jones's testimony, they would have reached a different result. Thus, even if Jones's testimony about Holtzclaw's prior inconsistent statement was admissible under Section 491.074, it was not reversible error to exclude it.[3]

---

[3] The State also argues that Defendant had no right to present this testimony on any ground because his counsel had disclosed to the trial court that it "may be untruthful." Of course, a defendant has no right whatsoever to testify falsely or present false evidence. See Nix v. Whiteside, 475 U.S. 157, 174-75 (1986). But we do not have a sufficient record on which to determine that Jones planned to commit perjury. See id. (habeas claim that counsel was ineffective and interfered with defendant's right to testify by persuading him not to lie on the stand was premised on a factual conclusion in the record that defendant planned to

10

Points I and II are denied.

In his third point, Defendant contends the trial court erred in overruling his Batson[4] objections to the State's peremptory strikes of two African-American venirepersons.

When the claim of error is preserved, we review the trial court's denial of a Batson challenge for clear error, giving great deference to the trial court's findings of fact based on its evaluation of the lawyers' and the prospective jurors' credibility and demeanor. State v. Murray, 428 S.W.3d 705, 709 (Mo. App. E.D. 2014). Where, as here, Defendant did not raise this issue in his motion for new trial and the claim is not preserved, we review only for plain error. State v. Miller, 162 S.W.3d 7, 16 (Mo. App. E.D. 2005). Regardless, Defendant has not shown any error in the court's denial of his Batson challenges, plain or otherwise.

The procedure for Batson challenges includes three stages. Id. at 14. First, the opponent must raise a Batson challenge to a specific person who was struck and identify the cognizable racial group to which the person belongs. Id. Second, the proponent of the strike must provide a reasonably specific and clear race-neutral explanation for the strike. Id. "The initial explanation is deemed race-neutral unless a discriminatory intent is inherent in the proponent's explanation, even if that explanation has a disparate impact on minority venirepersons." Id. Third, the opponent must show that the proffered explanation was merely pretextual and that the strike was racially motivated. Id. While

---

perjure himself and told counsel so). Moreover, having found no prejudicial error from its exclusion, it is unnecessary to determine whether it could have been excluded on this ground.

[4] Batson v. Kentucky, 476 U.S. 790 (1986).

11

the race-neutral explanation need not be persuasive initially, once the opponent claims pretext, "the persuasiveness and the plausibility of the explanation become relevant." Id. The opponent of the strike bears the burden of proving pretext. Id.

Here, the State sought to strike venirepersons McKinnon and Primus, who were both African-American women. Defendant properly raised raced-based Batson challenges to them both, and the State gave race-neutral reasons for the strikes. Thus, the only issue is whether those explanations were pretextual. The trial court should consider the totality of the facts and circumstances surrounding the case in determining pretext, focusing particularly on the existence of similarly situated jurors of another race who were not struck. Id. Other factors to consider are the degree of logical relevance between the proffered explanation and the case to be tried, attorney credibility based on demeanor, statements during voir dire and the trial court's past experiences with that attorney and the demeanor of the venirepersons subject to the strike. Id.

As to McKinnon, the State claimed she was struck due to "her inability to maintain steady work and employment."[5] McKinnon stated during voir dire that she recently returned to Missouri and was currently unemployed; she was a healthcare worker in Mississippi, but because she was not certified, she took whatever job she could get and was not able to keep steady work. Defendant argues this was pretext because a Caucasian woman who was not struck from the jury was similarly situated in that she was a stay-at-home mom and, therefore, was "unemployed just as venireperson McKinnon."

---

[5]The State later gave a second race-neutral reason regarding whether McKinnon would require additional information beyond the elements of the crime to convict. Defendant argued this explanation was based on a mischaracterization of McKinnon's voir dire answers and, therefore, was pretextual. The State seems to agree on appeal that it unintentionally misconstrued her answer. But the inaccuracy of the proffered reason does not necessarily render it pretextual. State v. Johnson, 220 S.W.3d 377, 382 (Mo. App. E.D. 2007). Rather, the proffering party's demeanor is more determinative of pretext, and we defer to the trial court on such matters.

This woman—like any other person who voluntarily chooses to care for his or her children full-time instead of working outside the home—is not at all "similarly situated" to a person like McKinnon who is involuntarily unemployed or, for whatever reason, unemployable. See Perkins v. Runyan Heating & Cooling Services, Inc., 933 S.W.2d 837, 840 (Mo. App. W.D. 1996) (unemployed person struck from jury not same as "homemaker" who was not struck).

As to Primus, the State's race-neutral explanation was that she changed jobs from being a pharmaceutical buyer for 10 years to driving a Metro bus—a career move that the State claimed was suspicious. Defendant argues this was pretextual because it incorrectly assumed this career move was from a "better job to a lesser job" without having asked Primus about salary or why she changed jobs. The accuracy of the State's explanation is not determinative. See State v. Johnson, 220 S.W.3d 377, 382 (Mo. App. E.D. 2007). Defendant points out that the State asked three other Caucasian jurors about their work, but did not ask about previous employment.[6] But he fails to demonstrate how these, or any other, venirepersons were actually in a similar employment situation as Primus. Defendant also challenges the State's reference to Primus watching Fox2News and possibly seeing coverage of the abandoned baby and missing women as a race-neutral reason for striking her. Defendant made no argument in any way at trial that this was

---

[6] The State points out that Defendant did not identify in the trial court any of the specific venirepersons who he now claims were similarly situated to McKinnon and Primus. Defendant did raise the issue of similarly situated persons generally: he argued that there were "a number of other" prospective jurors like McKinnon and Primus. Because nothing on this issue was preserved in a motion for new trial—and we find no merit to the point on appeal anyway—we need not determine whether the general statements made at trial were actually sufficient to preserve the more specific argument on appeal. See J.T. ex rel. Taylor v. Anbari, 442 S.W.3d 49, 60 n.2 (Mo. App. S.D. 2014). But we note that, even if the issue was otherwise preserved, we would be hard-pressed to find that a trial court erred in performing a comparison of similarly situated persons without such persons being identified.

13

pretextual. Thus, we decline to address his arguments regarding the pretext of this explanation on appeal. <u>Murray</u>, 428 S.W.3d at 714.

Finally, Defendant argues that employment status is not logically relevant to this first-degree murder case and, thus, was a pretextual reason to strike both of these women. This argument was also not raised in any way in the trial court, and we will not find error based on an argument that the trial court was not accorded an opportunity to rule on. <u>Id.</u> Moreover, unemployment and personal or employment instability has consistently been recognized as a sufficiently race-neutral explanation. <u>See</u> <u>State v. Andrews</u>, 770 S.W.2d 424, 431 (Mo. App. E.D. 1989); <u>State v. Payne</u>, 958 S.W.2d 561, 565 (Mo. App. E.D. 1997); <u>State v. Alexander</u>, 755 S.W.2d 397, 398 (Mo. App. E.D. 1988); <u>State v. Bennett</u>, 907 S.W.2d 374, 377 (Mo. App. E.D. 1995). We find no clear or plain error in the trial court's conclusion that Defendant did not meet his burden to show pretext.

Point III is denied.

The judgment is affirmed.

ROBERT G. DOWD, JR., Presiding Judge

Mary K. Hoff, J. and
Roy L. Richter, J., concur.

14