

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION ONE</u>

| | | |
|---|---|---|
| DYANTHANY Y. PROUDIE, | ) | No. ED109543 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Rex M. Burlison |
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent. | ) | FILED: April 19, 2022 |

Introduction

Dyanthany Y. Proudie ("Proudie") appeals the denial of his Rule 29.15[1] motion to set aside his convictions and sentence for murder in the first degree and armed criminal action. Proudie raises six points on appeal. Proudie alleges in Point One that Bradford Kessler ("Kessler"), Nicholas Williams, Michael Hufty ("Hufty"), and Thomas Peterson ("Peterson") (collectively "Trial Counsel")[2] were ineffective for failing to strike a juror who had prior knowledge of the victim and expressed personal feelings about the case. Proudie claims in Points Two, Three, and Four that Trial Counsel were ineffective for failing to subpoena and call Monica Bush ("Girlfriend"), Marcellus Gillespie ("Gillespie"), and Patricia West ("West"), respectively, because each witness would have provided a viable defense. Proudie's Point Five

---

[1] All Rule references are to Mo. R. Crim. P. (2016), unless otherwise indicated.

[2] Trial Counsel collectively refers to all four of Proudie's trial counsels because Proudie does not attribute his ineffective assistance claims to any particular individual for the purposes of this appeal.

contends Trial Counsel were ineffective for not attempting to impeach witness testimony from Ahmad Williams ("Williams"). Finally, in Point Six, Proudie claims that Trial Counsel were ineffective for failing to seek admission of hearsay testimony from Chad Jones ("Jones") as a prior inconsistent statement.

Trial Counsel exercised their judgment when choosing their peremptory strikes of jurors. Trial Counsel believed it was advantageous to use their limited number of peremptory strikes on other jurors and deemed Anthony Blalock ("Blalock") to be otherwise qualified as a juror. The decision not to strike Blalock was a reasonable trial strategy. Point One is denied. Because the testimonies of Girlfriend, Gillespie, and West failed to provide Proudie a viable defense, the decision not to call Girlfriend and Gillespie was not unreasonable. The decision not to call West did not prejudice Proudie. Points Two, Three, and Four are denied. Because Trial Counsel's decision not to attempt to impeach Williams's credibility regarding the potential recovery of reward money was reasonable trial strategy, Point Five is denied. Finally, because Proudie was not prejudiced by Trial Counsel's decision not to seek admission of Jones's testimony as a prior inconsistent statement, Point Six is denied. Accordingly, we affirm the motion court's judgment.

<u>Factual and Procedural History</u>

In the incident underlying this post-conviction appeal, Ebony Jackson ("Victim") arrived at Proudie's apartment in St. Louis with her three-year old son on January 2, 2013. Before arriving, Victim had exchanged nine phone calls with Proudie, whom she had previously dated. Proudie had invited Victim and her son to stay at his apartment along with Proudie's nephews, Williams and Gillespie. Williams was staying with Proudie while on winter break from college and Gillespie was fourteen or fifteen years old at the time. Maurice Holtzclaw ("Holtzclaw") and his wife also resided in the apartment.

When Victim arrived at Proudie's apartment, she wanted to take a bath and began cleaning out the bathtub. Holtzclaw saw Proudie walking towards the bathroom with a .38-caliber revolver in his hand. Williams saw Proudie place the revolver on top of the refrigerator. Proudie motioned for Williams, Gillespie, and Holtzclaw to go into the front room. Williams heard the bathroom door close and then heard the sound of a single gunshot. Proudie shot Victim behind the ear at close range, killing her.

Proudie called Holtzclaw into the bathroom, where Holtzclaw saw Victim "lying on the floor bleeding, motionless" and a "lot of blood on the floor." Proudie moved Victim's body in front of the refrigerator, just outside the bathroom door, and started to clean the bathroom. Williams saw the body outside the bathroom and noticed "blood everywhere." Proudie told Holtzclaw and Williams he killed Victim because she had given him a sexually-transmitted disease ("STD"), which he had passed on to Girlfriend. Proudie ordered his nephews and Holtzclaw to help clean up the murder scene. Proudie remodeled the entire bathroom over several days, replacing the floors, changing the fixtures, and painting. Proudie also directed Gillespie and Williams to scrub the basement floor after finding blood had seeped through the bathroom floor into the basement. Proudie discarded furniture from the basement that had blood stains.

Proudie directed Holtzclaw to help place Victim's body in the trunk of her car and drive it while Proudie followed in his truck. Proudie and Holtzclaw left Victim's car in a "derelict" neighborhood. Both men returned to Proudie's apartment. Proudie then instructed Holtzclaw and his nephews to say nothing if questioned by police.

Proudie abandoned Victim's son in a hallway of an apartment building approximately fifty feet from the apartment occupied by Proudie's estranged wife. Victim's son was found later

and his father was contacted. The father told police that Victim had traveled to St. Louis several days earlier and that he had been unable to contact her.

The police investigated Victim's disappearance. Several days after her murder, police located her car using its GPS and discovered her body in the trunk. Police obtained Victim's cell phone records and found her phone was used within approximately one-tenth of a mile of Proudie's apartment for all communications between 8:00 p.m. and 10:41 p.m. on the night of her murder. Additionally, Proudie's phone number—matched to Proudie's address through Crime Matrix—was the only number Victim called before departing for St. Louis that did not belong to family or friends. Despite Proudie's remodeling of the bathroom, police recovered evidence of Victim's DNA from a swab taken from Proudie's bathroom vanity.

During the investigation, Proudie and his family members took actions to intimidate both Holtzclaw and Williams. Holtzclaw had reached out to police and initially tried to protect Proudie. Eventually Holtzclaw told police "the complete truth." After learning that Holtzclaw had spoken to police, Proudie told Holtzclaw that it didn't matter what he said to the police as long as he didn't testify because Holtzclaw knows what happens "to people who testify." Detectives also interviewed Williams, who had returned to college in Arkansas and was reluctant to speak with police. Williams's statements matched Holtzclaw's account of the murder. Proudie's family members went to Arkansas to get Williams and bring him back to St. Louis. Williams was told he was going to be prosecuted and needed a lawyer. When Williams arrived at his grandmother's house in St. Louis, he saw that his face had been cut out of all the family pictures.

Prior to trial, Proudie attempted to introduce hearsay testimony from Jones, an acquaintance of Holtzclaw's who was incarcerated with Proudie. Holtzclaw testified he

4

"probably" told Jones that when disposing of Victim's body, he drove Victim's car with her body in the trunk, but he denied telling Jones or anyone that he murdered Victim. Proudie wanted Jones to testify because he believed Jones would say that Holtzclaw committed the murder and not Proudie. Proudie sought a late endorsement for Jones to testify, although one of his Trial Counsel, Kessler, found Jones not credible and believed Jones would perjure himself. Proudie made an offer of proof in which Jones testified that he overheard Holtzclaw say he intended to rob Victim and "it went bad and [Holtzclaw] ended up shooting her." Jones further testified that Holtzclaw said he "took her body out of there and moved it." Following the offer of proof, the trial court permitted Jones's late endorsement but ultimately ruled that Jones's testimony was inadmissible under the authority offered. Specifically, Proudie sought to introduce Jones's testimony through the hearsay exception involving statements against interest as set forth in Chambers v. Mississippi, 410 U.S. 288 (1973).

During voir dire, juror Blalock revealed that he had previously worked with two people who knew Victim. Blalock did not personally know Victim and assured the trial court that this information would not influence his decision-making or impartiality if selected for the jury. Blalock stated that the case was "disturbing to him" because a woman and a baby (Victim's young son) were involved, but "[t]hose facts alone will not cause" him "to be more bias[ed] against the defense[.]" When questioned further, Blalock responded that he would not "just shut down and stop listening" and that if he was chosen, he "would do it to the best of [his] ability."

The trial proceeded. The State called various witnesses to testify about the incident and police investigation, including Holtzclaw and Williams. In their case-in-chief, the State adduced evidence from various witnesses and police concerning the incident and the investigation. The State suggested Proudie's motive for murdering Victim was that she had given him an STD. The

5

jury convicted Proudie on murder in the first degree and armed criminal action. The trial court sentenced Proudie as a persistent felony offender to life imprisonment without the possibility of probation or parole on the count for murder and thirty years in prison for armed criminal action, with the sentences to run concurrently. Proudie directly appealed from his convictions, and this Court affirmed the judgment in State v. Proudie, 493 S.W.3d 6 (Mo. App. E.D. 2016).

In that direct appeal, Proudie argued the trial court should have admitted Jones's hearsay testimony under either the Chambers exception or as an inconsistent statement. We held that although the testimony could possibly have been admitted as an inconsistent statement, Proudie had only sought its admission under the Chambers exception, which did not apply because Proudie failed to meet the first prong that Holtzclaw be unavailable as the declarant. Moreover, we held Proudie's prior-inconsistent-statement argument was not properly preserved in the motion for new trial. Accordingly, we reviewed only for plain error, found no manifest injustice, and affirmed.

Subsequently, Proudie moved for post-conviction relief. In his amended motion Proudie raised ten points, five of which are at issue in this appeal: (1) Trial Counsel were ineffective for failing to strike for cause or peremptorily strike a juror, Blalock, who stated that he had personal feelings and information about the case because he used to work with two people who knew the victim; (2) Trial Counsel were ineffective for failing to interview, properly investigate, subpoena and call material witnesses, Girlfriend and Gillespie, whose testimony was necessary to provide Proudie with a viable defense; (3) Trial Counsel were ineffective for failing to interview, properly investigate, subpoena and call West who would have established that Holtzclaw was evading police, which would have provided a viable defense at trial; (4) Trial Counsel were ineffective for failing to impeach Williams's trial testimony by presenting evidence through

6

cross-examination of Williams and failing to call three witnesses to testify that Williams implicated Proudie in Victim's murder because he wanted to collect the reward offered for information that resulted in a conviction for Victim's murder; (5) Trial Counsel were ineffective for failing to argue Jones's testimony was admissible as substantive evidence under Section 491.074[3] as a prior inconsistent statement. Based on the claims raised in the amended motion, the motion court held an evidentiary hearing. All Trial Counsel testified in person at the hearing except Kessler, whose testimony was introduced via deposition.

As to Proudie's juror claim, Nicholas Williams testified that he conducted the voir dire and had decided not to strike Blalock. Counsel stated that he believed Blalock's responses, though not offered in absolute terms, showed Blalock could be fair and impartial, and that there were other venirepersons meriting a peremptory strike.

Trial Counsel testified regarding their decisions not to call certain witnesses. Regarding Girlfriend, Hufty testified that "Girlfriend would do more harm than good by corroborating the STD issue, which was bad evidence for [Proudie.]" Further, Girlfriend could not offer a persuasive alibi because "she could not testify that she was with [Proudie] all night" on the evening of the murder. Kessler, who testified he made the judgment call on which witnesses, if any, would testify for the defense, agreed with Hufty that Girlfriend's testimony would do more harm than good and was not worth introducing for a partial alibi that did not foreclose Proudie's presence at the murder scene. Concerning Proudie's nephew, Gillespie, Trial Counsel spoke with Gillespie several times and testified they did not believe he was a credible witness. In response to a question regarding Gillespie's credibility, Kessler testified that he "know[s] what happened . . . from a particular source" and did not want to call witnesses who would perjure

---

[3] All Section references are to RSMo (2000), unless otherwise indicated.

themselves.  As to the claim for failure to call West, Proudie's niece who was familiar with Holtzclaw, Trial Counsel testified they did not recall Proudie suggesting West as a potential witness.  West testified at the evidentiary hearing about her conversations with Holtzclaw, stating Holtzclaw had been scared to talk to the police, had hidden from the police, and had told her he had "done something wrong."  West testified Holtzclaw never told her he murdered someone or explain what he did that was wrong.

Trial Counsel testified as to Proudie's claim that they failed to impeach Williams on the grounds that Williams had been motivated to testify against Proudie by the offer of a monetary reward.  Hufty testified that Williams denied receiving any reward money at his deposition and that Trial Counsel would likely have pursued the reward-money theory if there had been evidence to support it.  Nicholas Williams testified he believed the reward money was "not a credible motivation behind [the] accusation" and that the defense team decided "to maintain some credibility with the jury and did not go down that avenue."  Proudie called additional witnesses to testify about Williams and the reward money.  Proudie's mother testified she learned from Facebook that Williams would receive reward money if he testified against Proudie; however, Williams's post did not specifically refer to reward money.  Proudie's sister testified that Williams told her that he was offered reward money in exchange for his testimony.  Proudie's niece ("Niece") testified that Williams, Niece's brother, told her he was offered money to testify against Proudie.

Trial Counsel also testified about the attempt to introduce Jones's hearsay testimony as a statement against penal interest.  Trial Counsel testified that Jones approached Kessler while Jones was incarcerated with Proudie and spontaneously offered to testify about Holtzclaw's

statements from a barbeque they both attended. Jones informed Trial Counsel that he overheard Holtzclaw admit to murdering Victim, which would have exonerated Proudie.

Following the evidentiary hearing, the motion court denied all claims in Proudie's amended motion. Regarding the three claims for failure to call a witness, the motion court concluded the testimony of Girlfriend and Gillespie was not credible and would not have provided a viable defense. The motion court found there was no reasonable probability the outcome of the trial would have been different had such testimony been admitted. The motion court also concluded Proudie failed to establish that the failure to call Girlfriend and Gillespie was not a valid trial strategy. Although Trial Counsel testified they did not recall West being mentioned as a potential witness, the motion court concluded there was no ineffective assistance of counsel because West's testimony would not have provided a viable defense to the murder charge. Concerning the failure to impeach Williams, the motion court found that Proudie failed to establish that the allegations about the reward money would have provided a viable defense that could have impacted the trial outcome. The motion court further found that Trial Counsel articulated a valid strategic reason not to present the reward-money issue to the jury. In considering the claim for failure to argue a different hearsay exception to admit Jones's testimony, the motion court noted that Holtzclaw denied making the statements presented in the offer of proof and that the offer of proof was not sufficiently reliable, not corroborated by any other evidence, and did not exonerate Proudie. The motion court also recognized that the hearsay issue was addressed on direct appeal, noting that we found no manifest injustice from the exclusion of Jones's hearsay testimony, particularly given overwhelming evidence in the record of Proudie's guilt. The motion court acknowledged that "[a] finding of no manifest injustice on direct plain error review does not establish a finding of no prejudice under Strickland" but that

9

"it is very rare that the difference in standards would cause a court to find ineffective assistance after relief has been denied on appeal under the plain error standard." Following the motion court's denial of his claims for post-conviction relief, Proudie now appeals.

## Points on Appeal

Proudie raises six points on appeal. Proudie argues in Point One the motion court clearly erred in denying his claim that Trial Counsel were ineffective for failing to strike for cause or peremptorily strike Blalock as a juror during voir dire because Blalock knew of the victim and expressed negative feelings about the case. In Point Two, Proudie claims that Trial Counsel were ineffective for failing to subpoena and call Girlfriend to testify because she would have provided an alibi for Proudie accounting for part of the night of the murder. In Point Three, Proudie contends Trial Counsel were ineffective for failing to call Gillespie because Gillespie's testimony about Williams's being in the upstairs apartment at the time of the murder would have impeached Williams's credibility. In Point Four, Proudie contends Trial Counsel were ineffective for failing to call West because West's testimony would have incriminated Holtzclaw instead of Proudie and provided a viable defense. Proudie argues in Point Five that Trial Counsel were ineffective for not attempting to impeach Williams because they failed to pursue the theory that Williams only implicated Proudie in order to collect a monetary reward. Finally, Proudie contends Trial Counsel were ineffective for failing to argue that Jones's hearsay testimony should have been admitted as a prior inconsistent statement.

## Standard of Review

We review a motion court's denial of post-conviction relief solely to determine whether its findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k); Shockley v. State, 579 S.W.3d 881, 892 (Mo. banc 2019). "A judgment is clearly erroneous when, in light of the entire record, the court is left with the definite and firm impression that a mistake has been

10

made." Shockley, 579 S.W.3d at 892 (internal citation omitted). We presume the motion court's findings of fact and conclusions of law are correct, and we defer to the motion court's determinations as to the credibility of witnesses. Id. (quoting Barton v. State, 432 S.W.3d 741, 760 (Mo. banc 2014)).

Discussion

I.      Strickland[4] Standard for Ineffective Assistance of Counsel

To prevail on a claim for ineffective assistance of counsel, a movant must show by a preponderance of the evidence both that (1) "[trial] counsel failed to exercise the level of skill and diligence reasonably competent [] counsel would in a similar situation" and (2) [the movant] was prejudiced by that failure." Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). If a movant demonstrates only deficient performance or only prejudice, but not both, the movant's claim fails. See id.; Zink v. State, 278 S.W.3d 170, 175 (Mo. banc 2009).

Under the performance prong, "[a] movant must overcome the strong presumption [that] [trial] counsel's conduct was reasonable and effective." McIntosh v. State, 413 S.W.3d 320, 324 (Mo. banc 2013) (internal citation omitted). "To overcome this presumption, a movant must identify 'specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance.'" Id. (quoting Zink, 278 S.W.3d at 176). In assessing trial counsel's performance, "[trial] [c]ounsel will not be deemed ineffective for reasonable choices of trial strategy no matter how ill-fated they may appear in hindsight." Bracken v. State, 453 S.W.3d 866, 872 (Mo. App. E.D. 2015).

To establish prejudice, a movant must show "there is a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different."

---

[4] Strickland v. Washington, 466 U.S. 668, 687 (1984).

11

McIntosh, 413 S.W.3d at 324 (quoting Deck v. State, 68 S.W.3d 418, 427 (Mo. banc 2002)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Hays v. State, 360 S.W.3d 304, 309 (Mo. App. W.D. 2012) (quoting Strickland, 466 U.S. at 694).

## II.    Point One—Failure to Strike a Juror

Proudie challenges the motion court's finding that he failed to meet his burden to overcome the presumption of reasonable trial strategy in evaluating Trial Counsel's decision not to move to strike for cause or peremptorily strike Blalock from the jury.

"Generally, the decision to strike a venireperson is a matter of trial strategy." Thompson v. State, 583 S.W.3d 529, 533 (Mo. App. W.D. 2019) (internal citation omitted). "Reasonable decisions regarding trial strategy cannot be the basis for an ineffective assistance of counsel claim." Id. "However, the failure to challenge a venireperson who admits to a prejudice to the defendant's detriment constitutes ineffective assistance absent an acceptable explanation." Id. It is the appellant's burden "to demonstrate that [d]efense [c]ounsel's failure to challenge" a venireperson "was not a strategic choice, but was instead the result of inattention or oversight." Armstrong v. State, 983 S.W.2d 643, 652 (Mo. App. S.D. 1999).

It is well settled that "[t]he qualifications for a prospective juror are not determined from a single response, but rather from the entire examination." Hosier v. State, 593 S.W.3d 75, 90 (Mo. banc 2019) (internal citation omitted). Unqualified jurors are those persons whose "views would prevent or substantially impair their performance as jurors." Id. "The relevant inquiry is whether a prospective juror can follow the law." Pearson v. State, 280 S.W.3d 640, 646 (Mo. App. W.D. 2009) (quoting State v. Chaney, 967 S.W.2d 47, 57 (Mo. banc 1998)). Importantly, "[a] possibility of prejudice is not sufficient to disqualify a juror: 'It must clearly appear from the evidence that the challenged venireperson was in fact prejudiced.'" Pearson, 280 S.W.3d at 646 (internal quotation omitted). We will not find trial counsel ineffective for failing to use a

12

peremptory strike to remove a juror who was otherwise qualified. Cummings v. State, 445 S.W.3d 648, 653 (Mo. App. E.D. 2014).

Here, Proudie posits Blalock was unqualified to serve as a juror because, during voir dire, Blalock said he would "try to stay impartial" after noting that he worked with two people who knew Victim. Blalock had also expressed that the case was "disturbing to him" because it involved a woman and a baby. At the same time, Blalock assured the trial court that "[t]hose facts alone" would not cause him to be biased against the defense. Trial Counsel testified at the evidentiary hearing about their strategy in choosing not to strike Blalock. In particular, Nicholas Williams explained that Blalock's answers could have been grounds for a peremptory strike, "if there were not six other people who were worse." Trial Counsel also concluded that a strike for cause would be denied, given Blalock's assurances of impartiality to the trial court. On appeal, Proudie maintains Blalock's qualified responses when asked whether his prior knowledge and personal experiences would affect his consideration of the evidence were insufficient. Blalock stated that he would not "just shut down and stop listening" if he were selected for the jury and "would do it to the best of [his] ability." Proudie suggests that, contrary to Trial Counsel's assessment, Blalock's statements showed that he could not remain impartial and unbiased.

We acknowledge that some of Blalock's responses were not absolute. However, when reviewing the record as a whole, we are not persuaded that the lack of an "absolute answer" indicates Blalock's bias against Proudie. "As much as judges and lawyers might desire it, people generally do not speak in absolutes, probably because they realize that few things are ever absolute." Ogle v. State, 807 S.W.2d 538, 542 (Mo. App. S.D. 1991) (internal quotation omitted). Blalock's responses do not indicate bias or prejudice towards Proudie, and the mere possibility of prejudice was not enough to disqualify Blalock. Pearson, 280 S.W.3d at 646. The

13

record supports a finding that Blalock was qualified as a juror because he agreed to follow the law and stated his prior knowledge of the facts would not substantially impair his ability to remain impartial.  See Hosier, 593 S.W.3d at 90; Pearson, 280 S.W.3d at 646 (quoting Chaney, 967 S.W.2d at 57).  The record is also clear that Trial Counsel stated their belief that a strike for cause would be denied and that there were other venirepersons meriting a peremptory strike over Blalock.  Because Blalock was not unqualified as a juror supporting a motion to strike for cause and because Trial Counsel strategically chose to use their peremptory strikes against other jurors, Trial Counsel was not ineffective for failing to use a peremptory strike to remove Blalock.  See Cummings, 445 S.W.3d at 653; Hosier, 593 S.W.3d at 90; Pearson, 280 S.W.3d at 646 (quoting Chaney, 967 S.W.2d at 57).

Absent evidence Blalock was biased against Proudie, we cannot hold that Trial Counsel were deficient for not striking Blalock, whether peremptorily or for cause.  See Thompson, 583 S.W.3d at 533.  The record shows that Trial Counsel exercised reasonable trial strategy.  See Bracken, 453 S.W.3d at 872.  Because Trial Counsel's performance was not deficient, Proudie's claim fails and we need not evaluate the prejudice prong of the Strickland standard to affirm the motion court's judgment denying Proudie's claim for ineffective assistance of trial counsel.  See Shockley, 579 S.W.3d at 892 (citing Strickland, 466 U.S. at 687); Zink, 278 S.W.3d at 175.  Point One is denied.

**III.    Points Two, Three, and Four—Failure to Subpoena and Call Material Witnesses**

Proudie claims that Trial Counsel were ineffective for failing to subpoena and call three witnesses, each of whom would have provided him a viable defense.  We address the merits of each of the three claims in the following discussion.

14

A.    Discussion

To succeed on a claim that counsel was ineffective for failing to call a witness, the movant must show: "(1) counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense." McFadden v. State, 553 S.W.3d 289, 305 (Mo. banc 2018) (internal citation omitted).  The decision not to call a witness is a matter of trial strategy, which is virtually unchallengeable. Id. at 298.  "[Trial] [c]ounsel's decision not to call a witness is presumptively a matter of trial strategy and will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise." Williams v. State, 386 S.W.3d 750, 753 (Mo. banc 2012).  "It is not ineffective assistance of counsel for an attorney to pursue one reasonable trial strategy to the exclusion of another, even if the latter would also be a reasonable strategy." McIntosh, 413 S.W.3d at 328 (quoting Clayton v. State, 63 S.W.3d 201, 207–08 (Mo. banc 2001)).

### 1.    Girlfriend (Point Two)

Proudie claims that Trial Counsel were ineffective for failing to subpoena and call Girlfriend to testify because she would have provided an alibi for Proudie accounting for part of the night of the murder.

The record supports a finding that Trial Counsel exercised reasonable strategy in not calling Girlfriend. See id. (quoting Clayton, 63 S.W.3d at 207–08).  At trial, the State pursued the theory that Proudie's motive for murdering Victim was that she had given him an STD, which was then transmitted to Girlfriend.  The factual record shows that Proudie dated Girlfriend after dating Victim and that Girlfriend would have testified about the STD claim, thereby bolstering the State's case.  At the evidentiary hearing, Trial Counsel explained their position that Girlfriend would have done more harm than good by corroborating the State's motive for

15

Proudie shooting Victim.  In addition, Girlfriend could not testify that she was with Proudie the entire night or at the time of the murder.  Trial Counsel decided the potential prejudice of Girlfriend's testimony outweighed any benefit of her testimony which would not have foreclosed Proudie's presence at the shooting.  The motion court found Girlfriend's testimony "was vague, confusing, inconsistent, not credible and did not establish the exact time [Proudie] was at her home on the day of the murder."

In light of the record, we agree with the motion court's determination that Girlfriend's testimony was not credible and contradictory with regards to Proudie's whereabouts the night of the murder.  See Shockley, 579 S.W.3d at 892 (quoting Barton, 432 S.W.3d at 760).  Contrary to Proudie's claim, Girlfriend's testimony would not have been merely cumulative as to the STD issue because unlike Holtzclaw and Williams, who testified to Proudie's motive for killing Victim, Girlfriend would have testified from personal, firsthand knowledge.  See Schweitzer v. Sinak Plumbing, 352 S.W.3d 404, 406 (Mo. App. E.D. 2011) (finding witness's testimony more credible than claimant's because it was based on firsthand knowledge).  Moreover, because Girlfriend could not account for Proudie's whereabouts at the time of the murder, her testimony would not have provided a viable defense.  See McFadden, 553 S.W.3d at 305.  Trial counsel pursued a reasonable trial strategy not calling Girlfriend to testify at trial because her testimony would have bolstered the State's claim that transmission of an STD was Proudie's motive for killing Victim.  Thus, Trial Counsel were not ineffective for failing to call her as a witness.  See id.; Williams, 386 S.W.3d at 753.

### 2.    Marcellus Gillespie (Point Three)

Proudie next faults Trial Counsel for not calling Gillespie as a witness.  Proudie reasons that Gillespie's testimony that he and Williams were upstairs at the time of the murder would

16

have impeached Williams's credibility by refuting Williams's claim that he was present in the apartment when Proudie murdered Victim.

Here, Trial Counsel exercised a reasonable trial strategy for not calling Gillespie. See McIntosh, 413 S.W.3d at 328 (internal citation omitted). Trial Counsel met with Gillespie several times before trial and deemed his testimony not credible. At trial, Holtzclaw and Williams gave identical accounts of the events surrounding the murder, while Gillespie would have deviated from their testimony. Gillespie would have testified that he was not in the apartment with Victim when she was murdered and only learned about the shooting days later from watching the news. Gillespie admitted he helped move Victim's bags into the apartment, but said he returned to the upstairs apartment once Victim's bags were inside. Proudie argues this testimony would have refuted Williams's testimony that Gillespie, Williams and Holtzclaw were in the apartment when Proudie shot Victim. Trial Counsel testified at the evidentiary hearing that they did not find Gillespie's statement credible and did not want to present perjured testimony. The motion court did not find credible Gillespie's testimony regarding the night of the murder or his testimony the he only heard about the murder days after it happened. The motion court credited Trial Counsel's testimony that they were sufficiently knowledgeable of the facts of the case to evaluate Gillespie's testimony and that they believed Gillespie would perjure himself.

We are not persuaded that the motion court clearly erred in determining that Gillespie's testimony was not credible and that Trial Counsel acted within their discretion not to call Gillespie as a witness. See Shockley, 579 S.W.3d at 892 (internal citation omitted). We agree that Trial Counsel made a strategic decision, which is virtually unchallengeable, not to call Gillespie because they believed he was not credible and wanted to retain credibility with the jury

17

by excluding his testimony.  See McFadden, 553 S.W.3d at 298.  Thus, Trial Counsel were not ineffective for failing to call Gillespie as a witness.  See id. at 305; Williams, 386 S.W.3d at 753.

### 3.    Patricia West (Point Four)

Proudie contends Trial Counsel were ineffective for failing to call West because her testimony would have undermined Holtzclaw's credibility, in that she witnessed him evading the police and Holtzclaw told her that he had "done something wrong."  Proudie's defense was premised upon accusing Holtzclaw as the person who shot Victim.

Proudie's position is unavailing because the failure to introduce West's testimony at trial did not cause Proudie prejudice.  See McIntosh, 413 S.W.3d at 324 (quoting Zink, 278 S.W.3d at 176).  At the evidentiary hearing, West testified that Holtzclaw instructed her to tell the police he was not home following Victim's murder because he "had done something."  West said that Holtzclaw did not explain what he had done.  Proudie claims West's testimony would have provided him a viable defense because it attacked Holtzclaw's credibility.  Holtzclaw testified he was present when Proudie shot Victim, helped destroy evidence and dispose of the body, "ducked" the police, and initially lied to the police to protect Proudie.  Holtzclaw also testified that he only talked to police after Proudie threatened him.

Trial Counsel testified that they did not recall Proudie ever informing them that West could testify to Holtzclaw's credibility.  Proudie asserted at the evidentiary hearing that he told Trial Counsel to call West for a viable defense, but Kessler testified Proudie had not told him how West's testimony would have been relevant to a possible viable defense.  See McFadden, 553 S.W.3d at 305 (noting a trial counsel is not ineffective for failing to call a witness who was not known to trial counsel).  We agree with the motion court's conclusion that even if West would have testified, her testimony would not have provided Proudie a viable defense.

18

Proudie cannot prevail on his claim without demonstrating prejudice under the Strickland standard. Here, Proudie has not met his burden to show that this additional testimony would have changed the outcome of his trial. The record reflects that the jury had the benefit of evaluating Holtzclaw's credibility. The jury heard evidence, through Holtzclaw's own admission, that he evaded and lied to the police and that he was testifying against Proudie out of fear for his own safety. Despite Holtzclaw's admissions, the jury found Proudie guilty of the charged offenses. We are not persuaded that not calling West to testify resulted in any prejudice to Proudie because West's testimony would have been merely cumulative of Holtzclaw's own testimony that he evaded the police and helped Proudie cover up the murder. See McIntosh, 413 S.W.3d at 324 (quoting Zink, 278 S.W.3d at 176).

Based on our review of the record, the absence of West's testimony does not undermine our confidence in the outcome at trial. See Hays, 360 S.W.3d at 309 (quoting Strickland, 466 U.S. at 694).

B.     Conclusion (Points Two, Three, and Four)

We defer to the motion court's determination that Trial Counsel's testimony at the evidentiary hearing was credible. See Shockley, 579 S.W.3d at 892 (quoting Barton, 432 S.W.3d at 760). Trial Counsel firmly asserted that they would not present perjured testimony. Proudie counters that Trial Counsel did not provide sufficient evidence to support their belief that any witnesses would perjure themselves. Trial Counsel reasons that giving a more detailed explanation would have violated the attorney-client privilege. The motion court cited Trial Counsel's experience as criminal defense attorneys in determining that Trial Counsel's testimony regarding perjured testimony was credible. The record shows that Trial Counsel testified that shortly before trial they obtained privileged information from Proudie suggesting that certain witnesses they were asked to call would offer perjured testimony. Trial Counsel informed the

19

trial court of their concern regarding potential perjured testimony before the trial started. Proudie suggests that Trial Counsel must disclose the substance of that privileged information that caused Trial Counsel to believe that a witness or witnesses would offer perjured testimony. We disagree. The decision not to call a witness remains a matter of trial strategy, which is virtually unchallengeable. McFadden, 553 S.W.3d at 298.

The motion court was in the best position to determine the credibility of Trial Counsel's testimony regarding perjured testimony. The record supports the motion court's determination that Trial Counsel provided a reasonable basis for their belief that certain testimony would be perjured. See State v. Hamilton, 791 S.W.2d 789, 798 (Mo. App. E.D. 1990) (holding that it was reasonable for counsel not to call witnesses under the belief they would perjure themselves because "both witnesses had a motive to commit perjury and their testimonies contained certain inconsistencies"); Berry v. State, 759 S.W.2d 247, 249 (Mo. App. E.D. 1988) (holding it was reasonable trial strategy not to present testimony when counsel could not substantiate movant's alibi beyond the testimony of family and friends, and counsel had a basis for believing the alibi had been fabricated). The motion court concluded that Trial Counsel's receipt of the privileged information provided Trial Counsel a reasonable basis to believe that certain witnesses would perjure themselves. We defer to the motion court's credibility determination and hold that Trial Counsel was not required to provide any further explanation. See Shockley, 579 S.W.3d at 892 (quoting Barton, 432 S.W.3d at 760).

The motion court was not clearly erroneous in finding Trial Counsel engaged in reasonable trial strategy when choosing which persons to call as witnesses at trial and which persons not to call. Bracken, 453 S.W.3d at 872. Because it was a reasonable trial strategy to not offer the testimony of both Girlfriend and Gillespie, and because Proudie was not prejudiced

20

by the failure to investigate or call West, Trial Counsel were not ineffective for failing to call them as witnesses. See id.; Shockley, 579 S.W.3d at 892 (internal citation omitted). A movant must satisfy both prongs to succeed under Strickland and Proudie failed to satisfy both prongs for all three witnesses. See Shockley, 579 S.W.3d at 892 (citing Strickland, 466 U.S. at 687); Zink, 278 S.W.3d at 175. The motion court was not clearly erroneous in finding no ineffective assistance for failing to call as witnesses Girlfriend, Gillespie, and West. See Shockley, 579 S.W.3d at 892 (internal citation omitted). Points Two, Three, and Four are denied.

## IV.    Point Five—Failure to Impeach Williams

Proudie claims Trial Counsel were ineffective for failing to impeach Williams by presenting evidence that Williams only implicated Proudie because he wanted to collect reward money offered for information resulting in a conviction for Victim's murder.

"The mere failure to impeach a witness does not entitle a movant to postconviction relief." Beck v. State, 637 S.W.3d 545, 555 (Mo. App. W.D. 2021) (quoting Fry v. State, 244 S.W.3d 284, 287 (Mo. App. S.D. 2008)). "The extent of cross-examination is usually a matter of trial strategy." Id. (quoting Hays v. State, 484 S.W.3d 121, 128 (Mo. App. W.D. 2015)). To prevail, a movant must show that counsel's "failure to present the impeachment evidence was unreasonable and outside the realm of trial strategy." Fry, 244 S.W.3d at 288. "When the testimony of a potential witness would only impeach the State's witnesses, relief on a claim of ineffective assistance of counsel is not warranted." Harding v. State, 613 S.W.3d 522, 530 (Mo. App. E.D. 2020) (quoting Hays, 360 S.W.3d at 310).

During his deposition, Trial Counsel confronted Williams with the allegation that he fabricated his story because he wanted to collect reward money that was offered for information leading to a conviction in Victim's murder. Trial Counsel concluded that "the reward was not a credible motivation" behind Williams's testimony against Proudie. Accordingly, Trial Counsel

21

declined to pursue the theory.  We find this was reasonable trial strategy.  In particular, the record lacks any evidence that the existence of an offer of a reward motivated Williams or that Williams received any reward money in exchange for his testimony against Proudie.  Because Trial Counsel believed the reward money did not motivate Williams's testimony, they "did not go down that avenue at trial in order to maintain some credibility with the jury."  Thus, Trial Counsel were not deficient for reasonably deciding against impeaching a witness with testimony that they believed was not credible.  See Beck, 637 S.W.3d at 555 (quoting Hays, 484 S.W.3d at 128).

We do not hold Trial Counsel ineffective for reasonable choices of trial strategy, including decisions regarding the presentation of impeachment evidence.  See Fry, 244 S.W.3d at 288; Bracken, 453 S.W.3d at 872.  Because Trial Counsel's performance was reasonable, we do not evaluate the prejudice prong of the Strickland standard to affirm the motion court's judgment denying Proudie's claim for ineffective assistance of counsel.  See Shockley, 579 S.W.3d at 892 (citing Strickland, 466 U.S. at 687); Zink, 278 S.W.3d at 175.  Point Five is denied.

**V.      Point Six—Failure to Argue Relevant Exception for Hearsay Testimony Admission**

Proudie contends Trial Counsel were ineffective for failing to seek admission of Jones's hearsay testimony as a prior inconsistent statement under Section 491.074.  Proudie sought to introduce Jones's testimony about hearsay statements from Holtzclaw that Holtzclaw committed the murder, not Proudie.

At trial, Proudie made an offer of proof.  Jones testified outside the presence of the jury that he overheard Holtzclaw say at a barbeque some time after the murder took place that he intended to rob Victim, shot her, and "took her body out of there and moved it."  Holtzclaw also testified about his conversation with Jones about Victim's murder.  Holtzclaw testified he

22

"probably" told Jones that he drove the car with Victim's body in the trunk to dispose of her body. However, Holtzclaw denied telling Jones that he, rather than Proudie, murdered Victim. Following the offer of proof, Trial Counsel argued before the trial court that Jones's testimony was admissible as a declaration against penal interest as in Chambers. The trial court ruled to exclude Jones's testimony, finding it did not satisfy the proffered hearsay exception.

The State suggests that Proudie's ineffective-assistance claim presents essentially the same issue reviewed on direct appeal, different only with respect to the standards of review. See Proudie, 493 S.W.3d at 9–10. Indeed, both the direct appeal and the post-conviction-relief appeal focus on the exclusion of Jones's testimony. On direct appeal, Proudie asserted the trial court erred in excluding Jones's testimony, maintaining that even if the Chambers exception was inapplicable, the trial court should have nonetheless admitted the testimony as a prior inconsistent statement under Section 491.074. In that case, reviewing the claim for plain error because it was not preserved in a motion for new trial, we found no manifest injustice or a miscarriage of justice from the exclusion of Jones's testimony. See Proudie, 493 S.W.3d at 13. Notably, in reaching that finding of no manifest injustice, we recognized the record contained overwhelming evidence of Proudie's guilt. See id.

> "Moreover, there was overwhelming evidence of [Proudie's] guilt that simply would not have been overborne by Jones's testimony. The eyewitnesses gave identical accounts of how this crime occurred and who committed it: Victim went in the bathroom alone to take a bath, and [Proudie] went in alone after her and shot her in the head because she had given him an STD. The eyewitnesses also both testified about [Proudie's] threats to harm them if they snitched and his extensive efforts to remove and destroy evidence to conceal his crime. We cannot say that had the jury heard Jones's testimony, they would have reached a different result. Thus, even if Jones's testimony about Holtzclaw's prior inconsistent statement was admissible under Section 491.074, it was not reversible error to exclude it."

Id. Proudie correctly points out that failure to prove manifest injustice on plain-error review does not automatically preclude a finding of prejudice under the Rule 29.15 clear-error standard.

23

See Deck, 68 S.W.3d at 427. Here, however, the motion court's findings of fact and conclusions of law expressly acknowledge the different standards and, further, indicate the motion court conducted its own review of Proudie's claim under the proper standard. See Shockley, 579 S.W.3d at 892 (internal citation omitted). The motion court noted overwhelming evidence of Proudie's guilt and concluded he could not prevail in showing Trial Counsel's failure to introduce Jones's testimony at trial prejudiced the outcome of his trial.

As the motion court recognized, despite the differences in the standards of review for plain error and clear error, "it is only in rare cases that those differences would cause a court to grant post-conviction relief after it has denied relief on direct appeal." Skipper v. State, 209 S.W.3d 552, 554 (Mo. App. S.D. 2006). Here, a careful review of the record supports the correctness of the motion court's assessment of the strength of the evidence in favor of conviction. In particular, the State presented two separate and identical eyewitness accounts of the events surrounding the murder. The record also comprehensively detailed Holtzclaw's involvement in the concealment and destruction of evidence following the murder, and how he evaded and lied to the police. The jury further heard Holtzclaw's own testimony that he had motives for testifying against Proudie.

As in Points Two, Three, and Four, the motion court was in the best position to determine the credibility of Trial Counsel's testimony regarding perjured testimony. We defer to the motion court's determination and hold that Trial Counsel was not required to provide any further explanation for their belief that certain witnesses would perjure themselves. See Shockley, 579 S.W.3d at 892 (quoting Barton, 432 S.W.3d at 760).

Contrary to Proudie's allegations of prejudice, Trial Counsel testified that Jones was not credible in part based on how Jones spontaneously approached them to offer the hearsay

24

statements at issue.  Given the record before us, Jones's testimony was otherwise uncorroborated and an outlier among the ample evidence of Proudie's guilt.  Therefore, even under the clear-error standard, we cannot say that there exists any reasonable probability that the outcome of the trial would have been different had Jones's testimony been admitted.  See McIntosh, 413 S.W.3d at 324 (quoting Zink, 278 S.W.3d at 176).  The motion court was not clearly erroneous in denying Proudie's claim.  See Shockley, 579 S.W.3d at 892 (internal citation omitted).  Point Six is denied.

## Conclusion

The judgment of the motion court is affirmed.

_____
KURT S. ODENWALD, Presiding Judge

Kelly C. Broniec, J., concurs.
John P. Torbitzky, J., concurs.