

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED111875 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | Cause No. 1922-CR02109-01 |
| | ) | |
| ISAIAH GHOLSON, | ) | Honorable Bryan L. Hettenbach |
| | ) | |
| Appellant. | ) | Filed: November 19, 2024 |

## Introduction

Isaiah Gholson (Defendant) appeals his conviction of one count of involuntary manslaughter, one count of assault in the first degree, and two associated counts of armed criminal action. He raises several claims of error: violation of the double jeopardy clause, racial discrimination in the State's peremptory strike of a juror during *voir dire*, admission of a witness identification through a tainted photographic lineup procedure, and exclusion of evidence of a victim's previous act of violence against another party unrelated to the incident at issue. We affirm.

## Background

The State charged Defendant with murder in the first degree, first-degree assault, and two counts of armed criminal action, for events taking place on June 9, 2019. The trial

court conducted a trial in January of 2023, which ended in a mistrial. A second trial took place in July of 2023, at which the jury heard the following evidence.

Victim 1 was a car mechanic who worked on cars at his residence, where he lived with his fiancé, Victim 2. On June 9, 2019, a young man called "Zay," later identified as Defendant, and his mother (Mother), came to the residence to talk to Victim 1 about a 2008 BMW that Victim 1 had repaired. Victim 1 had also loaned his and Victim 2's personal vehicle to Defendant and Mother while he was working on the BMW. The Victims' personal vehicle was damaged when Defendant and Mother returned it, and Victim 1 wanted payment for the damage in addition to payment for the repairs on the BMW.

Victim 1 asked Victim 2 to go to the BMW and start it. As Victim 2 was walking toward the vehicle, Defendant snatched the keys from her hand, got into the car, and started to drive away. Victim 1 jumped through the driver's side window and was hanging through the window as the car backed into the street. Victim 2 ran into the street to assist, jumping through the passenger side window. Mother came and grabbed Victim 2 out of the window, and they struggled briefly. Victim 2 ran toward the house, turned back to look at Victim 1, and saw Defendant shoot Victim 1 multiple times. She turned to run toward the house, was shot, and fell to the ground. A park ranger who was on duty at a park across the street heard the gunshots and saw two cars leave the scene: a gray BMW and a white Dodge Charger.

Victim 2 spent about three weeks in the hospital recovering from the gunshot, which had gone through her lung. Two days after the shooting, a detective (Detective) visited her in the hospital and asked her to view two photographic lineups. She identified Defendant as the shooter and Mother from the lineups that day.

2

The jury convicted Defendant of the lesser-included offense of voluntary manslaughter of Victim 1, first-degree assault of Victim 2, and two associated counts of armed criminal action. The trial court sentenced Defendant to 21 years' imprisonment.

Discussion

Defendant does not contest the sufficiency of the evidence to support his convictions. He raises four arguments on appeal. In Point I, he argues the trial court abused its discretion in denying his motion to dismiss the charges against him and conducting a second trial because there was no manifest necessity to declare a mistrial in his first trial, thus the trial court violated Defendant's right to be free from double jeopardy. In Point II, Defendant argues the trial court clearly erred in overruling Defendant's Batson[1] challenge to the State's peremptory strike of Juror 26, a black venireperson. In Point III, Defendant argues the trial court erred in denying Defendant's motion to suppress and in admitting Victim 2's identification of Defendant because the photographic lineup procedure was unduly suggestive and inherently unreliable. In Point IV, Defendant argues that the trial court erred in excluding evidence that Victim 1 had been in a violent dispute over payment for repair services on another person's vehicle 10 days prior to the shooting because it was relevant to show Victim 2 may have conflated that dispute with the one involving Defendant and Mother.

Point I

Defendant argues his retrial in this matter violated the double jeopardy clause because he did not acquiesce to the trial court's declaration of a mistrial in the first trial and because there was no manifest necessity for such declaration. We disagree.

---

[1] Batson v. Kentucky, 476 U.S. 79 (1986).

3

Defendant's first trial began on Tuesday, January 3, 2023, and was submitted to the jury on Friday, January 6, 2023, at 12:10 p.m. At 5:35 p.m., the jury returned to the courtroom and the following conversation ensued:

> THE COURT: [I]t's time to either quit for the night, stay for the night, come back tomorrow or Monday. So where are you right now as a – in your deliberations?
>
> FOREPERSON []: I think we're ready to leave for the evening, Your Honor.
>
> THE COURT: Do you – you are in some way – and don't tell me what the count is . . ., but are you deadlocked right now?
>
> FOREPERSON []: Yes, we are, Your Honor.
>
> THE COURT: Do you think that more time would allow you to do more thinking and reach a verdict?
>
> FOREPERSON []: I do not believe it would.
>
> THE COURT: Do I see any dissenters? Any show of hands? Any dissenters among the other eleven? All right.
> Then given that factor, I will declare a mistrial in this case. And in light of that, counsel, is there any legal reason why we should not discharge these jurors from their service at this time?
>
> [DEFENSE COUNSEL]: No, Judge.
>
> [PROSECUTOR]: No, Your Honor.
>
> THE COURT: All right. Then . . . I'm going to thank you for your jury service and discharge you from your service at this time.

The trial court entered an order on January 10, 2023, noting the court declared a mistrial "on January 6, 2023, when, after four days of trial and five and one-half hours of deliberation, the jury was unable to reach a verdict."

4

On January 26, 2023, Defendant filed a motion to dismiss for a violation of the double jeopardy clause, arguing the trial court's *sua sponte* declaration of a mistrial was not manifestly necessary. The trial court denied the motion and set the case for retrial on May 22, 2023. On March 30, 2023, Defendant filed a motion to reconsider the motion to dismiss. In it, he noted that one of the jurors from the first trial had told him that the jury vote at the time of the mistrial was 11 votes for not guilty and one vote for guilty. Defendant argued he did not consent to a mistrial and the circumstances did not show a manifest necessity to declare a mistrial.

The trial court held a hearing on Defendant's motion to reconsider on April 5, 2023. The trial court noted that there had been "a lot of consideration" prior to bringing the jury in on Friday evening about how the court personnel could logistically support the jury's continuing deliberations, if such deliberations were required, and whether the jurors themselves would be able to return the next day or the following Monday. The State noted that the court considered "the amount of time the evidence took versus how long they were deliberating," and that Defendant did not object to a mistrial. The trial court denied the motion to reconsider.

The decision to declare a mistrial rests within the sound discretion of the trial court, thus we will not reverse absent an abuse of that discretion. State v. Fassero, 256 S.W.3d 109, 115 (Mo. banc 2008); see also Illinois v. Somerville, 410 U.S. 458, 462 (1973) (noting "broad discretion" reserved to trial courts regarding declaration of mistrial "has been consistently reiterated in decisions of this Court"). An abuse of discretion occurs when the trial court's decision is clearly against the logic of the circumstances, and is so arbitrary

5

and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. Fassero, 256 S.W.3d at 115.

"Generally, the double jeopardy clause bars retrial if a judge grants a mistrial without the defendant's request or consent." State v. Tolliver, 839 S.W.2d 296, 299 (Mo. banc 1992). The defendant has a "valued right" to have the trial completed by a particular tribunal, which is implicated when a mistrial is declared, but which is also "subject to long-recognized exceptions permitting retrial: where there is a 'manifest necessity' for the declaration of the mistrial, or where the 'ends of public justice would be otherwise defeated.'" Id. (citing Oregon v. Kentucky, 456 U.S. 667, 671 (1982); Illinois v. Somerville, 410 U.S. 458, 464 (1973); Wade v. Hunter, 336 U.S. 684, 689 (1949)). Permitting retrial after a mistrial due to manifest necessity "accords recognition to society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws." Richardson v. U.S., 468 U.S. 317, 324 (1984) (quoting Arizona v. Washington, 434 U.S. 497, 509 (1978)).

The parties disagree regarding the initial matter of whether Defendant consented to the trial court's declaration of a mistrial here. Determining consent to a mistrial "turns not on a mechanical formula, but on careful analysis of the facts of each case." Tolliver, 839 S.W.2d at 299. Missouri courts hold that consent may be express or implied from the totality of the circumstances, and "implied consent to a mistrial has the same effect as an express consent and vitiates any double jeopardy bar to retrial." Id. (quoting Camden v. Circuit Court of Second Judicial Circuit, 892 F.2d 610, 614 (7th Cir. 1989)). "Key to

6

determining implied consent is whether the defendant had an opportunity to object." Id. at 300 (citing United States v. Puleo, 817 F.2d 702, 705 (11th Cir. 1987)).[2]

Defendant argues there was no meaningful opportunity to object here given that the trial court declared the mistrial *sua sponte*, in front of the jury, without giving Defendant an opportunity to object outside their presence. While Missouri courts have not considered this specific issue, some other jurisdictions have noted that under such circumstances, a jury could hold the defendant responsible for continued deliberations in the face of the jury expressing an inability to come to consensus. See Camden, 892 F.2d at 615 n.6 (citing Henderson v. Wright, 533 F. Supp. 1373, 1376 (D. Me. 1982)).[3] However, the Supreme Court of Missouri has focused on the opportunity to object, Tolliver, 839 S.W.2d at 300, and if the only such opportunity is in front of the jury, it is counsel's responsibility to request a sidebar conference outside their presence if he or she is concerned about the jury's reaction to an objection. In the event the trial court sustains counsel's objection, the court can notify the jury that it has reconsidered and finds the jury should continue deliberating.

Here, the trial court declared the mistrial and then paused for an objection by asking counsel whether there was any legal reason it should not discharge the jury, to which Defendant's counsel replied, "No, Judge." The record reflects Defendant had a clear opportunity to object at the judge's invitation prior to the jury's discharge, either in open

---

[2] Other jurisdictions applying this rule further indicate that the opportunity to object must be "meaningful." See, e.g., Love v. Morton, 112 F.3d 131, 138 (3d Cir. 1997).

[3] But neither court held that the defendant could not consent to a mistrial solely based on the fact that the jury was present in the courtroom. Camden, 892 F.2d at 615 n.6 (noting risk in dicta); Henderson, 533 F. Supp. at 1376 n.6 (also noting there was "no significant interval between the declaration of the mistrial and the discharge of the jury, such as would have permitted reconsideration by the trial judge upon objection by the defendant").

court or by requesting a sidebar conference outside the hearing of the jury.[4] Thus, we would find Defendant consented to the trial court's declaration of a mistrial.

However, acknowledging the Supreme Court of Missouri has not explicitly considered whether an opportunity to object in front of the jury under these circumstances is adequate and assuming *arguendo* Defendant did not consent to the mistrial, we would nevertheless find the trial court did not abuse its discretion in declaring a mistrial here. A jury's inability to reach a verdict "has long been considered the 'classic basis' establishing [a manifest] necessity" for a mistrial. Blueford v. Arkansas, 566 U.S. 599, 609 (2012) (citing Washington, 434 U.S. at 509); see also Huss v. Graves, 252 F.3d 952, 956-57 (8th Cir. 2001) (noting deadlocked jury is situation in which finding of manifest necessity "is almost always justified"). Moreover, great deference is required especially to a declaration of mistrial due to deadlock because "the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." Renico v. Lett, 559 U.S. 766, 774 (2010) (quoting Washington, 434 U.S. at 510 n.28).

The United States Supreme Court has "never required a trial judge, before declaring a mistrial based on jury deadlock, to force the jury to deliberate for a minimum period of time, to question the jurors individually, to consult with (or obtain the consent of) either the prosecutor or defense counsel, to issue a supplemental jury instruction, or to consider any other means of breaking the impasse." Renico, 559 U.S. at 775. Nor has the Supreme Court of Missouri required deliberation for a particular amount of time or the use of

---

[4] Defendant first raised an objection to the mistrial came in his motion filed after a juror approached defense counsel several weeks later and told counsel that the jury vote at the time of the mistrial was eleven to one in favor of acquittal.

8

supplemental instructions.  See Fassero, 256 S.W.3d at 116 (finding declaration of mistrial after four hours' deliberation not *per se* abuse of discretion; use of "hammer" instruction is never mandatory).  Rather, the trial court makes a discretionary decision in light of the totality of the circumstances, which requires deference even where reasonable jurists might choose differently.  Moussa Gouleed v. Wengler, 589 F.3d 976, 984 (8th Cir. 2009) (discussing Washington, 434 U.S. 497; that judges might have chosen differently does not undermine trial court's discretionary determination of manifest necessity).

Here, the trial court noted for the record that prior to the jury's return, the court had gathered court and security personnel to discuss how the jury might continue deliberating into the evening on Friday, returning on Saturday, or returning the following Monday.  The discussion included not only logistical issues but the jurors' availability.  Then, when the jury returned and the foreperson stated the jurors were ready to leave for the evening, the court asked whether they were deadlocked.  The foreperson replied that they were, and the court asked whether more time would help them reach a verdict.  Upon the foreperson's negative response, the court asked whether any of the other jurors disagreed.  The court then declared a mistrial after seeing no other juror dissent.  Under the circumstances, we do not find the trial court abused its discretion in declaring a mistrial.  Point denied.

### Point II

Defendant argues the trial court clearly erred in overruling Defendant's Batson challenge to the State's peremptory strike of Juror 26 because the State's proffered race-neutral reasons for the strike were pretextual.  We disagree.

We review a trial court's ruling on a Batson challenge for clear error.  State v. Meeks, 495 S.W.3d 168, 172 (Mo. banc 2016).  We will find the trial court's ruling clearly

9

erroneous if, after review of the record, we are left with a "definite and firm conviction that a mistake has been made." Id.

The equal protection clause prohibits striking a potential juror on the basis of race. Id. (citing Batson v. Kentucky, 476 U.S. 79, 89 (1986)). A Batson challenge to a peremptory strike of a venireperson involves a three-step, burden-shifting procedure. Id. First, a defendant must make a *prima facie* showing of purposeful discrimination, by "identify[ing] the cognizable racial group to which the venireperson or persons belong."[5] State v. Parker, 836 S.W.2d 930, 939 (Mo. banc 1992). It is then for the State to rebut the *prima facie* case by offering a race-neutral explanation. Id. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. . . . [D]isparate impact alone will not convert a facially race-neutral explanation into a *per se* violation of equal protection." Id. at 934 (citing Hernandez v. New York, 500 U.S. 352 (1991)).

Finally, the defendant then bears the burden to show that the State's proffered race-neutral reasons are merely pretextual justifications for underlying discrimination. Id. at 939; State v. Washington, 288 S.W.3d 312, 315 (Mo. App. E.D. 2009). The trial court should consider many factors in making this determination, chief of which is "the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case." Parker, 836 S.W.2d at 939. "The existence of similarly situated white jurors who were not struck by the prosecutor is certainly probative of pretext." Id. Additionally, the court should consider the demeanors of the prosecutor

---

[5] It is not necessary for the venireperson to belong to the same racial group as the defendant. State v. Parker, 836 S.W.2d 930, 933 (Mo. banc 1992) (noting the United States Supreme Court dispensed with such requirement in Powers v. Ohio, 499 U.S. 400 (1991), because Batson challenges are to protect not only the defendant's equal protection rights but those of the venireperson as well).

and excluded venirepersons, as well as the logical relevance of the explanation to the case to be tried. Id. The trial court's determination is a finding of fact that we review for clear error. Id. at 939 n.7 (citing Hernandez, 500 U.S. at 368-69).

Here, the State used a peremptory strike to exclude Juror 26, a black female. In making its Batson challenge, defense counsel noted that Juror 26 "did not make one statement during jury selection." Defense counsel further pointed out that a white female venireperson seated right next to Juror 26 also did not make any statements during *voir dire*. Defense counsel noted both women were similar in age, had high school degrees, and were unemployed. Defense counsel argued the only significant difference between the two women was their race.

The State responded that it exercised only two of its six peremptory strikes against black venirepersons and that several black individuals remained on the panel. The prosecutor further explained that he would have struck both potential jurors if he could have, but the reason he chose Juror 26 rather than the white venireperson was that the latter was married to a car wholesaler, and that "might have something to do with why she's unemployed." Additionally, the prosecutor noted that Juror 26 had served on a jury at a criminal trial previously, making him think "she's the person that always remains quiet and gets on the trial, and I'm not sure whether that's a good thing . . . ."

The trial court then asked defense counsel how the State's reasons were pretextual, and defense counsel responded that marital status was "so irrelevant," and that the State did not ask Juror 26 about her prior jury service, so it must not be important to the State. The trial court denied Defendant's Batson challenge, saying, "[i]n particular, given the racial makeup of the entire panel," the court would accept the State's explanation.

11

The parties do not dispute that Juror 26 belonged to a cognizable race and that the State's explanation was facially race-neutral. The issue is whether Defendant established that the State's reasons for distinguishing Juror 26 from the white venireperson sitting next to her—that Juror 26 was unmarried thus differently affected by unemployment and that Juror 26 had previously served on a jury in a criminal case—were pretextual.

While Defendant correctly notes that marital status is not relevant to the factual circumstances of the instant case, the prosecutor compared Juror 26's marital status with that of the white venireperson in order to make a conclusion about their respective unemployment. "[U]nemployment . . . has consistently been recognized as a sufficiently race-neutral explanation." State v. Proudie, 493 S.W.3d 6, 15 (Mo. App. E.D. 2016); State v. Payne, 958 S.W.2d 561, 565 (Mo. App. E.D. 1997). Juror 26 was single and unemployed, whereas the white venireperson was married to a car wholesaler, which the prosecutor inferred may relate to her unemployment. See Proudie, 493 S.W.3d at 14 (noting "stay-at-home mom" not similarly situated to someone involuntarily unemployed).

Additionally, the prosecutor felt Juror 26's silence combined with her prior jury service in a criminal case might indicate she was trying to be selected for this particular jury, reasoning that unknown answers to questions could be positive or negative regarding her suitability for this venire panel. The State did not have to know definitively that her answers would be negative in order to exercise a strike on the suspicion that they might be. See State v. Payne, 958 S.W.3d at 565 (citing Parker, 836 S.W.2d 930) ("The prosecution is entitled to play 'hunches,' so long as they are race-neutral and not pretextual").

12

Finally, the trial court noted that the State did not strike several other black venirepersons. While this fact is not determinative of racial discrimination,[6] it is relevant to the trial court's factual finding regarding the prosecutor's discriminatory intent, which is a key factor in the trial court's determination of pretext. See Parker, 836 S.W.2d at 940 (State's failure to use all of its peremptory strikes to remove venirepersons of racial minority or presence of racial minority members on jury are relevant "only to the extent that they indicate that race was not the prosecutor's motive for the challenged strikes"); cf. State v. Johnson, 220 S.W.3d 377, 382 (Mo. App. E.D. 2007) (demeanor of attorney exercising strike is determinative factor, even where proffered reason is inaccurate).

In light of the circumstances here, we do not find the trial court clearly erred in denying Defendant's Batson challenge to the State's strike of Juror 26. Point denied.

Point III

Defendant argues the trial court clearly erred and abused its discretion in denying Defendant's motion to suppress and admitting evidence and testimony from Victim 2 that identified Defendant as the person who shot her and Victim 1 because Detective failed to follow police procedure in administering the photographic lineup, and Victim 2's identification is therefore unreliable. We disagree.

Defendant filed a pretrial motion to suppress identification arguing that the photographic lineup procedure used by police was unduly suggestive in that Detective failed to follow proper police procedure in three ways: (1) failing to give required instructions prior to showing the lineup to Victim 2, (2) failing to use a blind administrator, and (3) using a photo array in which Defendant stood out, all of which resulted in an

---

[6] See Flowers v. Mississippi, 588 U.S. 284, 298 (2019) (noting the "basic equal protection point: In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many").

13

unreliable identification. The trial court held a hearing at which Detective, who had administered the photographic lineup, testified. He stated that he read the instructions printed on the photographic lineup to Victim 2, which included a statement that the person who shot her may or may not be in the lineup. He also testified that though police procedures call for use of a blind administrator, or someone who does not know who the suspect is, he administered the lineup knowing that Defendant was the suspect, due to "exigent circumstances." Detective testified that Victim 2 had described the shooter as having a dark complexion, and the photograph of Defendant in the lineup shows his skin darker than it actually is. Detective further noted the lighting of three of the six photographs in the lineup, including Defendant's, was darker than the other three. He testified that he did not compile the photographic lineup, but that police have to use pictures that are available, and the one they had for Defendant was a juvenile picture.[7] Defense counsel asked Detective whether he gave Victim 2 any feedback after she identified Defendant, referring to her deposition in which she stated that Detective told her she "did a good job." Detective testified that he did not remember Victim 2 asking whether she chose correctly nor responding that she "did a good job," and it did not sound like something he would say. He was aware that police procedure prohibited giving feedback following a witness' identification.

The trial court entered an order denying the motion to suppress, finding Detective's testimony at the hearing credible and noting the police made reasonable efforts to ensure that Defendant did not stand out in the photo array. The court found that even though some of the procedures were questionable, in light of the totality of circumstances, the procedures

---

[7] Defendant was 17 years old when the shooting took place.

were not impermissibly suggestive, such as to taint Victim 2's identification. The trial court admitted Victim 2's testimony identifying Defendant as well as the photographic lineup at trial, over Defendant's objection.

We will reverse a trial court's ruling on a motion to suppress only if we find it was clearly erroneous, and we will reverse the trial court's admission of evidence only if it constituted an abuse of discretion. State v. Kayser, 397 S.W.3d 37, 39 (Mo. App. E.D. 2013). We review the record made at the suppression hearing as well as the evidence at trial, giving deference to the trial court's credibility findings. State v. Morgan, 480 S.W.3d 349, 351 (Mo. App. E.D. 2015); State v. Ivy, 455 S.W.3d 13, 17-18 (Mo. App. E.D. 2014).

Missouri courts utilize a two-prong test for admission of identification testimony: (1) whether the identification procedure was impermissibly suggestive, and (2) if so, whether such procedure rendered the identification unreliable. Kayser, 397 S.W.3d at 40 (citing State v. Hornbuckle, 769 S.W.2d 89, 93 (Mo. banc 1989)). "A pretrial identification is unduly suggestive when the identification results from police procedures or actions, instead of the witness' recall of first-hand observations." Id. (quoting State v. Eoff, 193 S.W.3d 366, 375 (Mo. App. S.D. 2006)). If a defendant does not establish the procedure was impermissibly suggestive, we need not reach the second prong. Id.; State v. Body, 366 S.W.3d 625, 629 (Mo. App. E.D. 2012).

Here, Defendant raises the same arguments he raised in his motion to suppress—that Detective failed to give proper instructions prior to administering the photographic lineup, that he was not a blind administrator, and that Defendant's picture stood out in the photo array—adding that Detective also improperly affirmed Victim 2's choice following her identification of Defendant in the photographic lineup, artificially bolstering her

confidence that Defendant was the shooter. Upon review of the record, giving deference to the trial court's determination that Detective was credible, we do not find clear error in the court's denial of Defendant's motion to suppress or an abuse of discretion in the admission of Victim 2's identification testimony at trial.

First, Defendant argues Detective failed to instruct Victim 2 that the shooter may or may not be present in the photographic lineup as required by police procedure. However, Detective testified at the suppression hearing that he read the printed instructions, which included a statement that says the person may or may not be present in the lineup. The trial court found Detective's testimony credible. Further, Victim 2 testified at trial that Detective told her "if the man that shot you is in this lineup, then circle him." This conditional statement implies that the shooter may not be present in the lineup. We find nothing in the record to indicate Detective's pre-administration instructions were suggestive. Cf. State v. Allen, 274 S.W.3d 514, 525 (Mo. App. W.D. 2008) (even where police tell witness lineup contains picture of suspect, lineup is not impermissibly suggestive).

Second, Defendant argues the lineup procedure was impermissibly suggestive because Detective was not a blind administrator, in that he knew Defendant was the suspected shooter. Detective acknowledged that police procedure required the use of a blind administrator for lineups, but he said "due to exigent circumstances," he did not follow that procedure here. Defendant presented expert testimony at trial regarding scientific research showing that non-blind administrators can unconsciously signal to the witness who the suspect is, even if they do not say anything. However, Detective denied doing anything to suggest who Victim 2 should identify, and there is nothing in the record

16

indicating otherwise.  The fact that Detective did not follow departmental procedure for a blind administrator went to the weight of the evidence, rather than admissibility.  State v. Snider, 535 S.W.3d 382, 388 (Mo. App. E.D. 2017).  Defendant's expert testified regarding the potential problems with Detective's administration of the lineup, and the jury was free to believe the expert and reject Victim 2's identification accordingly.

Third, Defendant argues that the photographic lineup improperly highlighted Defendant.  Victim 2 had told the police that the shooter had a "very dark" complexion, and three of the photographs in the six-photo array, including Defendant's, were darker than the other three.  Detective also acknowledged that the photograph of Defendant in the lineup made his complexion appear darker than it actually is.  Detective testified that that particular photograph was the only one police had available to use for the lineup.  Missouri courts require police only use reasonable efforts to find physically similar individuals for lineups, thus differences in age, weight, height, hairstyle, complexion, and even background color of the photographs do not *per se* amount to impermissible suggestiveness.  State v. Conrick, 375 S.W.3d 894, 900-01 (Mo. App. W.D. 2012) (quoting State v. Floyd, 347 S.W.3d 115, 125-26 (Mo. App. E.D. 2011)).  The trial court here found that the police used reasonable efforts to ensure that Defendant did not stand out in the photo array, and we do not find its conclusion clearly erroneous under the circumstances.

Finally, Defendant argues that Detective told Victim 2 that she "did a good job" after she identified Defendant, thus artificially inflating her certainty that Defendant was the shooter.  We defer to the trial court's finding that Detective's testimony was credible, and when asked whether he made such a comment to Victim 2, he said, "I don't think I did," and "that doesn't sound like something I would say."  Moreover, we find no case law

holding that statements made *after* a witness makes an identification render the procedure leading up to the identification impermissibly suggestive. Kayser, 397 S.W.3d at 42 (noting after-the-fact statement cannot taint an already completed identification procedure). The jury heard Victim 2's testimony regarding Detective's statement and was free to believe her over Detective. Additionally, Defendant's expert testified regarding the effect any such comment can have on a witness' certainty, and the jury was free to weigh such evidence against Victim 2's testimony that she was one-hundred-percent certain that Defendant was the shooter. However, given the totality of the circumstances and our standard of review, we do not find the trial court clearly erred in refusing to exclude the identification on this basis.

Defendant has not shown that the identification procedures here were impermissibly suggestive or that Victim 2's identification resulted from police procedures, rather than her own recollection of first-hand observations. Therefore, we need not consider the impact of the procedure upon the reliability of the identification. Kayser, 397 S.W.3d at 42. Point denied.

Point IV

In his final point, Defendant argues the trial court abused its discretion in excluding evidence that Victim 1 had been involved in a violent dispute over payment for work performed on another person's vehicle 10 days prior to the shooting here because such evidence was relevant to show that Victim 2 may have conflated the two events, thereby misidentifying Defendant. We disagree.

A trial court has broad discretion over the admission or exclusion of evidence, and we will not reverse a trial court's ruling unless it is clearly against the logic of the

18

circumstances. State v. Taylor, 298 S.W.3d 482, 491 (Mo. banc 2009). To be admissible, evidence must be both logically and legally relevant. State v. Prince, 534 S.W.3d 813, 817 (Mo. banc 2017). "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." Id. (quoting State v. Collings, 450 S.W.3d 741, 756 (Mo. banc 2014)). "Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." Id. at 818 (quoting State v. Anderson, 306 S.W.3d 529, 538 (Mo. banc 2010)).

Here, Defendant sought to introduce the testimony of a police officer (Officer) who had responded to the victims' home on May 31, 2019 for a reported assault. Victim 1 had worked on a car belonging to a father and stepson, who had come to pick up their vehicle and had gotten into an altercation with Victim 1. The father and stepson alleged that Victim 1 had attacked them by grabbing one of them by the neck and striking one of them with a crowbar. Officer was also part of the investigation of the shooting at issue here, and he immediately recognized Victim 1 as the suspect in the incident occurring 10 days before.

Defendant argues this evidence was logically relevant to show that it was possible Victim 2 misidentified Defendant and his mother, confusing them with the other parent and child who had come to pick up a vehicle and had had a violent interaction with Victim 1. However, Defendant offered no evidence that Victim 2 was aware of this incident, and in fact, when asked about it, Victim 2 said she was not present on May 31, 2019 and did not recall any such altercation. Further, even if Defendant could show Victim 2 knew about the previous incident, the parent in that incident was a father, whereas the parent on the

19

day of the shooting was a mother, making misidentification less likely. Thus, this evidence had very little, if any, probative value.

In weighing the legal relevance, the trial court noted that the testimony was prejudicial to Victim 1, in that it was evidence of an unrelated act of violence by Victim 1. Prior acts of violence of a murder victim are relevant for only a very limited purpose, when the defendant has injected the issue of self-defense. State v. Waller, 816 S.W.2d 212, 216 (Mo. banc 1991) (announcing the rule that "[w]here justification is an issue in a criminal case, the trial court may permit a defendant to introduce evidence of the victim's prior specific acts of violence of which the defendant had knowledge, provided that the acts sought to be established are reasonably related to the crime with which the defendant is charged"). Here, because probative value is lacking, Defendant cannot show it outweighs the prejudicial effect. Evidence of this prior altercation that was completely unrelated to the incident at issue, and of which neither Defendant nor Victim 2 had knowledge, did not meet the test for admissibility, and the trial court did not abuse its discretion in excluding it. Point denied.

## Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
Gary M. Gaerther, Jr., J.

Philip M. Hess, P.J., and
Renee D. Hardin-Tammons, J., concur.

20